```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF GEORGIA
 2                         ATLANTA DIVISION

 3

 4   CARYL QUASHIE,                    )
                                       )
 5                 Plaintiff,          )
                       v.              )   CIVIL ACTION
 6                                     )   FILE NO. 1:17-CV-03081-MLB
                                       )
 7   OLYMPUS AMERICA, INC. ET AL,      )
                                       )
 8                 Defendants.         )
     _____)
 9

10

11   -------------------------------------------------------------

12           BEFORE THE HONORABLE MICHAEL L. BROWN
                   TRANSCRIPT OF PROCEEDINGS
13                       MAY 21, 2018

14   -------------------------------------------------------------

15

16

17          Proceedings recorded by mechanical stenography
              and computer-aided transcript produced by

18

19             JANA B. COLTER, FAPR, RMR, CRR, CRC
                   Realtime Systems Administrator
20                   Official Court Reporter
                     1949 U.S. Courthouse
21                   75 Ted Turner Drive, SW
                     Atlanta, Georgia  30303
22                       (404) 215-1456

23

24

25
```

```
 1   APPEARANCES:

 2
     For the Plaintiff:        VIRGINIA ANELLO
 3                             DIANA YASTROVSKAYA
                               MICHAEL BRANDON SMITH
 4                             Attorneys at Law

 5   For the Defendant:        JACOB D. CHARLES
                               JENNIFER R. BURBINE
 6                             RICHARD C. BEAULIEU
                               Attorneys at Law
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1    (Atlanta, Fulton County, Georgia, May 21, 2018, in open

2 court.)

3                          —  —  —

4                    P R O C E E D I N G S

5

6         THE COURT:  Y'all can be seated.  Give me just a

7 second, though, to get organized.

8         Okay.  Good afternoon, everyone.

9         MR. CHARLES:  Good afternoon.

10        MS. ANELLO:  Good afternoon.

11        THE COURT:  We are here on the case of Quashie -- am

12 I saying that right?

13        MS. ANELLO:  Yes.

14        THE COURT:  -- versus Olympus America, et al,

15 17-CV-3081.  Could I ask each of the parties to please announce

16 themselves?

17        MS. ANELLO:  Virginia Anello with Douglas & London on

18 behalf of the plaintiff, Caryl Quashie.

19        MS. YASTROVSKAYA:  Diana Yastrovskaya on behalf of

20 the plaintiff, Caryl Quashie, Douglas & London also.

21        MR. SMITH:  Brandon Smith, Your Honor, on behalf of

22 Ms. Quashie from Childers, Schlueter & Smith here in Atlanta.

23        THE COURT:  Hello.

24        MR. CHARLES:  Good afternoon, Your Honor.  Jacob

25 Charles with McGuire Woods on behalf of the defendants.

```
 1            MS. BURBINE:  Your Honor, Jennifer Burbine, McGuire
 2   Woods, on behalf the defendants.
 3            MR. BEAULIEU:  Your Honor, Richard Beaulieu, also
 4   McGuire Woods, on behalf of defendants.
 5            THE COURT:  Thank you.  Mr. Beaulieu, you're not
 6   related to Nick Beaulieu, are you, the doctor?
 7            MR. BEAULIEU:  No, unfortunately not.
 8            THE COURT:  No, okay.  All right.  So I have read two
 9   different sets of motions to dismiss.  One on the
10   jurisdictional grounds and one on the pleadings grounds.  I
11   have read all of the papers on those.  I have also read a
12   number of cases, some of which you-all cite, the Brazil case,
13   there's another case called Betancourt and another case called
14   GenTran Corp, but I have read those cases?  And I will turn it
15   over to the parties to begin.  Do you all want to handle the
16   personal jurisdiction issue first?
17            MR. CHARLES:  I think that makes sense.
18            MS. ANELLO:  It would make sense, expect for one
19   thing.  I feel that their shotgun pleadings argument kind of --
20   their personal jurisdiction argument is dependent upon some of
21   the other arguments they made with respect to the shotgun
22   pleadings, and specifically you can't have more than one
23   allegation against -- you can't have an allegation against more
24   than one defendant's argument, and I think because that ties in
25   there, there could be an argument with having that first, but
```

1  if the Court would like to do personal jurisdiction, I'm fine

2  with that as well.

3          THE COURT:  I think that probably makes sense.  And

4  I'll tell you my concern.  My concern at the outset is that the

5  plaintiff's complaint, I think there is complaint -- a

6  complaint that can be drafted that satisfies jurisdiction

7  against maybe all but certainly some of the defendants.  And I

8  think also it can satisfy the requirements for the various

9  causes of action.

10          I am, however, concerned by while it might not be

11  technically a shotgun pleading, I think you-all make a point

12  that where the Eleventh Circuit says it's a shotgun pleading,

13  it means that you alleged all of the facts cumulatively for

14  each count, so that the final count is a summary of all prior

15  allegations.  So while it may not meet that definition of it,

16  that by alleging defendants in the plural each time, that you

17  do away with the need for specificity as to each defendant.

18          And if we were dealing with three different

19  companies, one company that manufactured it, let's say, one

20  company that was in charge of marketing it and one company that

21  was in charge of training, let's say, and let's say they

22  weren't all Olympus affiliates, I think it would be really hard

23  if you were one of defendants to defend against the claim where

24  they're all lumped in together.  And so my concern is what the

25  defendants say is that by alleging everyone each time, you do

1  away with the need for specificity as to any individual

2  defendant and it makes it hard for me to assess jurisdictional

3  elements when I can't tell what one defendant is alleged to

4  have done versus another defendant.  And so I'd like you to

5  address that.

6          On the other hand, defendants could have maybe made

7  this a tougher issue on the jurisdiction by putting forth an

8  affidavit that challenged some of the allegations.  And so we

9  saw, for example, there were other cases against the Olympus

10  Groups and we're talking about one case in particular in Texas

11  where we see where they came in with an OMSC corporate

12  representative giving an affidavit in which he challenged the

13  idea that OMSC was availing itself of business in Texas.  And

14  in this case, the defendant didn't do that.  And so maybe I

15  have to accept the general defendants plural portion for the

16  purposes of jurisdiction, because -- I'm almost done.  I'm

17  going to let you go in just a second.

18          Because it's hard for me otherwise to assess personal

19  jurisdiction.  But I think that becomes an impediment and a

20  problem for the plaintiff when you get into the other motion to

21  dismiss, because there is no specificity in that instance.  I

22  don't know who you claim had the duty.  I don't know who you

23  claim said what.  And I don't think I have to credit as

24  strongly the allegation that everybody did it.  I think that

25  under *Twombly*, I have to hold you to a higher level of

1  specificity, particularly on the fraud claims, and there's four

2  of them.

3          So I'd like you-all to address that issue.  Because

4  the way I'm leaning to this, and I'm telling you this on the

5  front end, is I'm leaning towards granting the motion to

6  dismiss on jurisdictional issues, on jurisdictional claim

7  subject to -- no, I'm sorry.  Let me scratch that.  My clerk is

8  going to remind me that that's not what we were thinking.  I'm

9  considered denying the motion to dismiss on jurisdictional

10  issues, although I have real concerns about jurisdiction over a

11  Japanese parent without more evidence of them actually doing

12  something in Georgia.  But I'm considering that I have to

13  accept the allegations and that they probably are enough in the

14  absence of some affidavit that contradicts them.

15          But granting the motion to dismiss on the other

16  pleading standards, subject to giving you an opportunity to

17  amend.  That's where I'm leaning.  And so I'd like you-all to

18  in your argument address the way I see it.  And I think that

19  the jurisdictional issue, the way I read the law and the way I

20  read the *Brazil* case and other cases that it cites,

21  particularly the *Betancourt* case, is that I probably have to

22  accept those uncontradicted general allegations, but that I

23  probably don't on the motion to dismiss for failure to state a

24  claim side, okay?

25          So with that -- and I bring that up at the beginning,

1   Ms. Anello, because you sort of said that that general defense

2   and their claim of a shotgun pleading somehow merges the two,

3   and I do think it does.  I think there is a common issue there.

4   But I think it cuts against each of you on a different issue.

5   So anyway, I'll turn it over to you.

6           MS. ANELLO:  Oh, okay.  I will be glad to argue

7   first.  It's defendants' motion.  I don't if there's a

8   preference. regarding the personal jurisdiction --

9           THE COURT:  I'm sorry.  I'm going to the

10  jurisdictional issue.  I'll let them go first, but you looked

11  like you wanted to say something a minute ago.

12          MS. ANELLO:  No.  They can go first.

13          THE COURT:  Okay.

14          MS. ANELLO:  You probably said a lot of my argument

15  with what you just said right now about personal jurisdiction.

16          THE COURT:  Okay.  Go ahead.

17          MR. CHARLES:  Would you prefer if I come up to the

18  podium?

19          THE COURT:  Whatever makes you comfortable.  You can

20  stand, you can sit, you can come up, whatever makes you

21  comfortable.  I don't have a preference.

22          MR. CHARLES:  I'll spread out here.  Your Honor, I

23  think you're correct that the issue on personal jurisdiction

24  comes down to the fact that the plaintiffs have failed to

25  distinguish between the entities, which is particularly

1    important here when there are two U.S.-based entities that have

2    not objected to personal jurisdiction.  There is Olympus

3    America, Inc. and Olympus Corporation of the Americas, and

4    there are two Japanese entities.  And there are no specific

5    allegations about what each individual entity has done.

6           And, Your Honor, we'd submit that the *Brazil* case

7    actually supports the finding that when the complaint fails to

8    ascribe particular conduct to any one defendant, in *Brazil*, it

9    was J&J, that the Court said there that that means that they

10   cannot satisfy their initial burden of proving minimum

11   contacts.  Similarly, Your Honor, the Supreme Court's

12   jurisprudence in *Burger King* recognizes that this Court's

13   inquiry under the personal jurisdiction analysis is to analyze

14   each individual defendant's contacts with the foreign state.

15          Here, the main problem is this failure to distinguish

16   among the defendants, the American entities, which do business

17   in the U.S., and the foreign entities, the Japanese entities,

18   but I would suggest, Your Honor, that it goes further than

19   that.  Not only is there a failure to distinguish among them,

20   but there are no particularized allegations about conduct

21   occurring in the State of Georgia, regardless of who's doing

22   the actions.

23          Ms. Quashie wants this Court to accept legal

24   conclusions and conclusory allegations about what happens in

25   Georgia, which is not what this Court should accept.  For

1    instance, Your Honor, courts in this district have rejected

2    similar types of allegations that just restate the state

3    long-arm statute.  In *GenTran*, which Your Honor noted, for

4    instance, the Court rejected as conclusory the allegation that,

5    quote, defendant committed tortious acts that it knew or should

6    have known would cause injury to plaintiff in this judicial

7    district.

8          Similarly, another court in this district, in

9    *Perrigo*, rejected the allegation that, quote, defendants may be

10   found or transact affairs in this district.  The kind of

11   conclusory allegations in the complaint about what happened in

12   Georgia, if anything, are insufficient to confer jurisdiction

13   here.

14         Similarly, Your Honor, under the due process clause,

15   the minimum contacts analysis requires an act of purposeful

16   availment.  There are no factual allegations that suggest that

17   OMSC or Olympus Corporation, separate and distinct from each

18   other and from the American entities, took any action within

19   Georgia to purposely avail themselves of the benefits and

20   protections of Georgia law.

21         THE COURT:  What about, though, their allegation that

22   both of those entities conducted and transacted business in

23   Georgia and derived substantial revenue from products sold and

24   used in Georgia?

25         MR. CHARLES:  Your Honor, we would submit that those

1  are legal conclusions.  The Eleventh Circuit in *Diamond*

2  *Crystal*, when it explained what the prong one of the long-arm

3  statute requires, says:  We analyze all of the contacts, both

4  the tangible and intangible contacts and then we determine

5  whether that constitutes the transaction of business under

6  Georgia law.  So the transaction of business is a legal

7  conclusion that is derived after viewing the allegations of the

8  tangible and intangible contacts.

9          THE COURT:  Well, that's what I'm trying to do.  I'm

10  trying to get the facts from which you could decide whether or

11  not there's transacting business in Georgia.  And I'm not sure

12  that -- I'm not sure either of you has really given me enough.

13          MR. CHARLES:  Yes.

14          THE COURT:  And I'm afraid that that means -- I'm not

15  afraid.  I think that that means I have to just accept the

16  allegation.  Why do I then have to accept it?

17          MR. CHARLES:  Your Honor, you don't have to accept it

18  because -- for the personal jurisdiction inquiry, you only have

19  to accept well-pleaded, factual allegations, not conclusions,

20  such as did they transact business or derive substantial

21  revenue.

22          Your Honor, as you recognized, OMSC and Olympus

23  Corporation did not submit an affidavit, but that's because the

24  burden never shifted under the second prong of the

25  jurisdictional inquiry.  Under the first prong, Ms. Quashie had

1  the burden, this is what the Eleventh Circuit said in *Mazer*,

2  the burden to plead, quote, sufficient facts to establish a

3  prima facie case.  So to the extent this Court is concerned

4  that there aren't sufficient facts, that's because we submit

5  the plaintiff hasn't plead a prima facie case.

6        For instance, if there would have been allegations

7  that OMSC or Olympus Corporation had engaged in a contract with

8  Emory Johns Creek Hospital to sell this Q180V scope or that

9  they had shipped the scope directly to Georgia, those would be

10  factual allegations that could be rebutted by an affidavit.

11        THE COURT:  Right.

12        MR. CHARLES:  There aren't those kind of allegations

13  here.  OMSC and Olympus Corporation would be hard-pressed to

14  craft an affidavit to rebut legal conclusions and conclusory

15  allegations.

16        THE COURT:  Give me a second to look at the Dixie

17  Crystal case. I hadn't seen that one.

18        MR. CHARLES:  *Diamond Crystal*.

19        THE COURT:  I'm sorry, *Diamond Crystal*.

20        MR. CHARLES:  It's an Eleventh Circuit case.

21        THE COURT:  Right.  I've got it up now.  Just give me

22  a second to find that portion.  Yeah, see --

23        MR. CHARLES:  It's Page 1264 of that opinion,

24  Your Honor.

25        THE COURT:  It's 1264?  Okay.  I'm on 1263.  I'm just

 1  trying to get to the part you cited.  We examine all the

 2  nonresidents' tangible and intangible conduct and ask whether

 3  it can be fairly said that the nonresident has transacted any

 4  business in Georgia.  That's what you're referring to?

 5          MR. CHARLES:  That's right, Your Honor.  That's the

 6  legal conclusion, the outcome of the analysis.

 7          THE COURT:  Right.  But, see, in that case, though,

 8  the defendant filed an affidavit in which they challenged the

 9  bald allegation, right?

10          MR. CHARLES:  I'm not confident that it was just a

11  bald allegation there.

12          THE COURT:  And you're right.  I don't know whether

13  it was just a bald allegation or not.  But they sort of put at

14  issue that.  And I also looked at the one case that's got --

15  one of the clients is something called Bospart Holland.  Do you

16  know this case?

17          MR. CHARLES:  I don't believe I'm familiar with that,

18  Your Honor.

19          THE COURT:  I don't know which case that comes from.

20  I'll tell you if I find it.  I know the civil action number is

21  15-CV-222.  I don't think it's a Georgia case, though.  I think

22  it's -- maybe it is a Georgia case.  But here, there was just

23  an allegation that they had engaged in business within the

24  jurisdiction.

25          MR. CHARLES:  Um-hmm.

```
1              THE COURT:  And they challenged that, just like they

2    did in the Brazil case.  But in the Brazil case, J&J, there was

3    an allegation that they were all of them, it was sort of like

4    here.

5              MR. CHARLES:  Yes.

6              THE COURT:  A shotgun allegation that all of the

7    defendants were engaged in -- the same thing they say here,

8    everything, marketing, manufacturing, researching and

9    developing, all of that, which we know probably no company does

10   all of that.

11             MR. CHARLES:  Right.

12             THE COURT:  Or at least in a situation like this,

13   they don't all do all of that.

14             MR. CHARLES:  Right.

15             THE COURT:  But J&J came forward with an affidavit

16   that said we're just a holding company and we don't do any of

17   those things.  And then the court held that that rebutted it,

18   that shifted the burden to the plaintiff, and the plaintiff was

19   not capable of coming forward with their own evidence from

20   which a judge could look at it and could make an assessment of

21   due process or the long-arm statute.

22             Here, if you look at their complaint, and you say,

23   for example, they allege that these two defendants designed,

24   researched, tested, manufactured, promoted these scopes, and in

25   particular the scope at issue, into the stream of commerce, and
```

```
 1   that they then transacted business in the State of Georgia, if
 2   that's true, and that they derived substantial income --
 3              MR. CHARLES:  Yes.
 4              THE COURT:  -- if that's true, they probably satisfy
 5   the third prong, if you add into it the fact that the plaintiff
 6   was injured.
 7              MR. CHARLES:  Yes.
 8              THE COURT:  The third part of the long-arm statute,
 9   Section 3.  And they probably also satisfy due process.  My
10   guess is, is that your client would say we didn't do those
11   things.
12              MR. CHARLES:  Yes, sir.
13              THE COURT:  But I can't reach that yet.
14              MR. CHARLES:  So two points in response, Your Honor.
15   One I would say, again, I think those are legal conclusions,
16   and, in particularly, the deriving substantial revenue.
17              THE COURT:  Sure.
18              MR. CHARLES:  What normally happens is there is
19   factual allegations about how much revenue somebody did.
20              THE COURT:  Right.
21              MR. CHARLES:  And then the court would decide is that
22   substantial revenue.
23              THE COURT:  Yes.
24              MR. CHARLES:  So a bald statement that they derived
25   substantial revenue is not sufficient.  And, secondly, I would
```

1    just suggest that even if it satisfies the long-arm statute,

2    the due process analysis is different.  This is what the

3    Georgia Supreme Court said in *Innovative Clinical* and what the

4    Eleventh Circuit reiterated in *Diamond Crystal*, and that

5    requires purposeful availment.

6             I do not think that if there was an allegation that

7    this Court did accept as true that one of these entities or

8    both of these entities derived substantial revenue from sales

9    in Georgia that would satisfy the due process clause, because

10   the revenue -- there would be no relationship between what that

11   revenue was derived from and the claims at issue in this case.

12   It could be the case from this allegation, Your Honor, that

13   they derived substantial revenue from other medical products

14   that they sold in this state and the due process analysis

15   requires the relationship to the claims at issue here.

16             THE COURT:  So if they were to show that they

17   transacted business in the State of Georgia, would that be

18   enough to satisfy due process?

19             MR. CHARLES:  It would not, Your Honor.  The -- a

20   case that the plaintiffs cite in their opposition brief, the

21   case from the Southern District of Georgia, and I'm forgetting

22   exactly the name of it.

23             THE COURT:  Yeah.  You address it in a footnote, I

24   think.

25             MR. CHARLES:  Yes, that's right.

```
 1              THE COURT:  I know what you're talking about.

 2              MR. CHARLES:  I think the sale from a company up

 3    north into Georgia, the district court there found that

 4    satisfies the transacting business because they sold it to a

 5    plaintiff in Georgia, shipped it directly to Georgia, but it

 6    did not satisfy the due process clause, because there was no

 7    showing there, no factual allegation there to suggest the

 8    defendant purposely availed themselves.  It just so happened

 9    that the plaintiff had resided in Georgia and the defendant

10    shipped it there.  The due process analysis is different for

11    that reason, because the Georgia Supreme Court has said that

12    the long-arm statute could be read to reach farther so that

13    should be limited by the due process clause.

14              And, Your Honor, the Supreme Court's recent state of

15    jurisprudence on personal jurisdiction suggests that each

16    individual defendant's conduct needs to be analyzed separately,

17    that allegations like this, that each and every defendant did

18    actions without describing them with particularity is

19    insufficient to confer jurisdiction, particularly over two

20    foreign corporations.

21              THE COURT:  Unless they each actually did design,

22    research, test, manufacture, promote, sell, et cetera,

23    et cetera, et cetera.

24              MR. CHARLES:  Yes.

25              THE COURT:  Right.  So if they both did those
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1    things --

2              MR. CHARLES:  If all four of them did those things.

3              THE COURT:  The two that are at issue here.

4              MR. CHARLES:  Yes.

5              THE COURT:  If those two did those things, then it

6    would be okay for them to plead them the same.  And I think

7    what you say is commonsensible, and that's why I say that I

8    have concerns over the jurisdictional issue.  And more so over

9    on the due process side, because I do think that there is --

10   well, maybe it's over both of them.  I have some concerns about

11   those.  I'm just afraid that -- I don't have a case that says

12   these broad allegations unchallenged by a defendant are

13   nonetheless insufficient, right?

14              I think that that's what the case says on the issue

15   of the 12(b)(6).  But on the jurisdictional issue, I don't have

16   one that says these types of overly broad allegations are

17   insufficient.  Because I think the way it's meant to work is

18   plaintiff's can allege broadly, defendants can decide whether

19   they're challenging jurisdiction, and if they are going to,

20   they file something that challenges it that says no, we don't

21   do this, that and the other thing.  And that puts it at issue.

22   Here's our evidence and then they have to come forward with

23   specific things from which a real analysis can be done.

24              But in the absence of a challenge to the factual

25   allegation at a motion to dismiss stage, I don't see a case

1   that says I can go beyond the pleadings and say well, they

2   don't really do these things.  Do you see what I mean?

3          MR. CHARLES:  Yeah.  Yes, Your Honor.  I take your

4   point.  And I think what *Mazer*, the Eleventh Circuit said in

5   *Mazer* and *Future Technology* that the way the burden shifting

6   framework is supposed to work is that the plaintiff has the

7   initial burden to plead a prima facie case and that requires

8   factual allegations that are sufficient to shift the burden.

9   So we suggest that the burden never shifted in this case for

10  the defendant to put it at issue, because there are no factual

11  allegations to rebut.  Your Honor's cites, that the string

12  citation in the plaintiff's complaint that all of the entities

13  did manufacturing and designing, that alone would not be

14  sufficient.  That's just conduct that they would engage in.

15         The allegation that I think this Court -- that come

16  most closely to alleging jurisdiction are the allegations that,

17  for instance, they transact business or they derive substantial

18  revenue, but again, we would suggest that those are not factual

19  allegations, those are legal conclusions.  And the courts in

20  this district in *GenTran* and *Perrigo* have rejected very similar

21  allegations that are just conclusory and said we don't rely on

22  those to see if the plaintiff has established a prima facie

23  case.

24         And in *GenTran*, for instance, Your Honor, there was

25  an allegation both that the -- that the parent company and two

1  of its subsidiaries were subject to personal jurisdiction in

2  the State of Georgia.  The Court looked at the parent company

3  and said this is not a prima facie case.  It didn't even

4  analyze any affidavit or rebuttal evidence and was dismissed

5  there without allowing for any kind of further inquiry.

6       As to the subsidiary, it said there was sufficient

7  allegations that there alter ego and the court allowed further

8  inquiry there.  I think the same should still hold true here.

9  To the extent Your Honor is concerned about a lack of factual

10 allegations, that is plaintiff's failure to meet her prima

11 facie case under step one of the jurisdictional.

12      THE COURT:  Let me just read *GenTran* again.

13      MR. CHARLES:  This is in Footnote 3 where the Court

14 rejects that conclusory allegation.

15      THE COURT:  Okay.  I'll look at this case some more.

16 I mean, my concern -- I see what you're saying.  The

17 allegations in it seem to be -- they abandon B and C.

18      MR. CHARLES:  Right.

19      THE COURT:  Let me look at the one where she goes and

20 Judge Martin says B and C wouldn't be enough anyways.

21      MR. CHARLES:  Yes.

22      THE COURT:  Okay.  It says B is a legal conclusion,

23 that is, it committed tortious acts.  And then C, it says is

24 not okay because of *the Asahi Metals* case.  So what that would

25 mean is that I would have to look at, just by way of example,

1    the allegations in Paragraphs 38, 39, 40 and 41 and 42, and see

2    whether those allegations, if true, would satisfy jurisdiction.

3         MR. CHARLES:  I think what the court says in Footnote

4    3 is that the allegation in Subparagraph B there was a legal

5    conclusion that it does not consider as true to support the

6    jurisdiction.

7         THE COURT:  But that's because the allegation there

8    was that it committed tortious acts that it knew would cause

9    injury in the judicial district.  That's not what they're

10   alleging here.  Here they're alleging that --

11        MR. CHARLES:  Right.

12        THE COURT:  -- they designed, researched, tested,

13   manufactured, marketed, promoted and sold the scope into the

14   stream of commerce.

15        MR. CHARLES:  Then I would suggest that there is --

16   there's not a jurisdictional basis under 38, if the Court

17   accepted that as true.

18        THE COURT:  Well, you've got to read them all

19   together.

20        MR. CHARLES:  Okay.

21        THE COURT:  So then you would say -- it was curious

22   to me that they didn't say including into Georgia, but

23   that's -- then the next one, that they conducted business in

24   Georgia, that they derived substantial revenue from goods and

25   products used in Georgia, and they should have expected

1  consequences from their acts and the revenue they obtained in

2  Georgia.  Right?  And would that be enough.  And you say it

3  would not because they didn't link the alleged malfeasance in

4  this case to the conduct or to the revenue they got in Georgia.

5          MR. CHARLES:  Yes.

6          THE COURT:  Okay.

7          MR. CHARLES:  Yeah.

8          THE COURT:  I see that point.  And I don't -- I might

9  have to look at that a little harder.  But the other part of

10 the *GenTran* case is, again, it falls into what I was noting,

11 which is that the defendant came forward and said we're a

12 holding company that never advertised, marketed, distributed or

13 delivered products to anyone, much less consumers in Georgia.

14         MR. CHARLES:  Yes.

15         THE COURT:  And your client could have come forward

16 and said we never designed, researched, tested, manufactured,

17 anything or put anything in the stream of commerce or

18 transacted business in Georgia or derived substantial revenue

19 from items in Georgia.  And I saw that that's essentially what

20 they did in the Texas case.  And then that would sort of front

21 the issue of well, what did they do.  Do you see what I mean?

22         MR. CHARLES:  Yes, Your Honor.

23         THE COURT:  Because it could be -- and maybe that's

24 it, maybe I will just -- it may be what you're telling me is

25 that even if you accept these allegations as true, and I don't

1  find them to be legal conclusions, that they are not enough to

2  support jurisdiction.

3        MR. CHARLES:  Yes.  They would support long-arm

4  jurisdiction if the Court accepted them as true, but they would

5  not satisfy the due process clause.  And I think that a case

6  here that's helpful is a case in this district *McCarthy v.*

7  *Yamaha Corporation*.  That is a case where there was an in-state

8  manufacturer of a wave runner that injured a plaintiff and the

9  plaintiff sued not only the in-state manufacturer, but its

10  indirect parent company in Japan.  And the Court said even if

11  it's true that the Japanese entity designed the subject wave

12  runner, bought it from the in-state entity and controlled --

13  and was the parent company of the in-state entity, that's not

14  enough under the due process clause to show that the Japanese

15  entity purposely availed itself by directing its activities in

16  the State of Georgia.

17        THE COURT:  Okay.  I think I understand.  I mean,

18  this has been helpful to me in that it's maybe focused me on

19  one part away from my belief that in the absence of an

20  affidavit, it's probably enough.  I mean, maybe I've got to go

21  back and look at whether if you accept these things, you meet

22  due process.

23        I think that if you accept these things, you meet the

24  long-arm statute, because I think they were focusing on the

25  long-arm statute, particularly Section 3, I think it is.

24

```
1              MR. CHARLES:  And Section 1 as well.

2              THE COURT:  Section 1, as well.  That's the

3    transacting business?

4              MR. CHARLES:  That's right.

5              THE COURT:  And the second one I thought was deriving

6    substantial revenue.

7              MR. CHARLES:  That's the third.

8              THE COURT:  Yeah.  I'm sorry.  The third.  Yeah,

9    okay.  Give me one more second.

10             MR. CHARLES:  Yes, Your Honor.

11             THE COURT:  So you would say that the allegation of

12   transacting business in Georgia and deriving substantial

13   revenue from Georgia, from goods and products used in Georgia,

14   is not enough to show that they purposefully availed themselves

15   to the forum and therefore, must stand in the forum.

16             MR. CHARLES:  Yes, Your Honor, for instance, they

17   could have come to Georgia and transacted business on a wholly

18   separate product and that wouldn't meet the due process

19   analysis, even though it would satisfy the long-arm statute.

20             THE COURT:  I see that.  I mean, it is -- there's a

21   case I read in some of this that addressed that issue

22   specifically, it could be that they did a lot of other things

23   in Georgia that made them money, but here, they don't say

24   transacted business and derived money and that that was the

25   scope.  And I would assume that Olympus sells a whole lot of
```

1    other goods.

2              MR. CHARLES:  That's correct, Your Honor.

3              THE COURT:  I don't know if they still sell cameras,

4    they did at one time, but I would assume that they sell a lot

5    of other goods in Georgia, make lots of money off of them, and

6    this scope is just one of them.  That's your point?

7              MR. CHARLES:  That's my point.  And my point as well

8    is that the Japanese entities are distinct and the American

9    entities are the ones that there's been no challenge to

10   personal jurisdiction.

11             THE COURT:  Right.  No, I get it.  But, see, what

12   you're doing there is you're trying to say that there are other

13   reasons to doubt it.

14             MR. CHARLES:  Yes.

15             THE COURT:  But I thought we agreed --

16             MR. CHARLES:  If you accept it.

17             THE COURT:  -- if you accept it, because guys haven't

18   challenged it.

19             MR. CHARLES:  Yes.

20             THE COURT:  And then the next question is should I

21   give them time to conduct jurisdictional discovery?

22             MR. CHARLES:  I think the answer to that is no for

23   two reasons.  One, they haven't asked for jurisdictional

24   discovery.

25             THE COURT:  Yeah, right.

1        MR. CHARLES:  And the case law here points to the

2   lack of diligence and the reason to deny jurisdictional

3   discovery.  For instance, in *Mazer*, the court affirmed the

4   district court's refusal to allow jurisdictional discovery on

5   those grounds.  The same thing in the *GenTran* case, Your Honor,

6   as to the parent entity.

7        And the second reason, Your Honor, is because, at

8   least it's our contention they haven't met their prima facie

9   burden, and without that, there's no reason for jurisdictional

10  discovery.  It would be useful in an instance where there was

11  an affidavit and they would have to probe the factuality or the

12  factual statements made in the affidavit, that's when the Court

13  would allow jurisdictional discovery, when they haven't even

14  alleged facts to hold these entities subject to the personal

15  jurisdiction, they're probably subject to this Court's personal

16  jurisdiction, we'd submit that jurisdictional discovery would

17  be inappropriate, Your Honor.

18        THE COURT:  Okay.  Thank you.  Anything else you want

19  to say?

20        MR. CHARLES:  Thank you.  Not at this time,

21  Your Honor.

22        THE COURT:  Okay.  Thank you.

23        Ms. Anello?

24        MS. ANELLO:  Yes, Your Honor.  You don't mind if I

25  sit here?  Everything is just spread out in front of me.

1          THE COURT:  That's fine with me.

2          MS. ANELLO:  Just I'd also like to point out that

3    Paragraph 8 is also a jurisdictional allegation and it does

4    talk about deriving substantial revenue from goods used in

5    Georgia, including the Q180V scope and other similar duodenum

6    scopes, so there are allegations about deriving substantial

7    revenue from duodenum scopes and the Q180V scope at issue in

8    this case.  There's also an allegation that they sold -- that

9    the foreign defendant sold this particular Q180V scope to the

10   hospital at issue in this case.

11          I agree, I think with everything that's been

12   discussed, I'm definitely going off of my outline, but I

13   definitely agree that the legal standard --

14          THE COURT:  Would you hang for one second?

15          Mr. Charles, I'm going to ask you to address that

16   when she's done, okay?

17          MR. CHARLES:  Sounds good, Your Honor.

18          MS. ANELLO:  Okay.  I just definitely agree that the

19   legal standard is not what was presented by the defendants

20   because they have not produced an affidavit or there's not been

21   an evidentiary hearing regarding the jurisdictional issue.  And

22   so the real issue, the real standard is whether the plaintiff

23   has -- has alleged sufficient -- has made sufficient

24   allegations in order to support a reasonable inference that

25   there is personal jurisdiction and we submit that it has been

1  done here through the various paragraphs set forth in the

2  complaint that were identified and discussed today.

3       I would also just like to, you know, call the Court's

4  attention to the *Black Box* case, which just talks about the

5  standard of what you should look at when there is -- when no

6  evidence has been submitted.  And just motions to dismiss for

7  lack of personal jurisdiction should be treated with caution.

8  And, again, it sets forth the standard that only if the

9  plaintiff has failed to allege sufficient facts to support a

10 reasonable inference that defendant can be subjected to this

11 jurisdiction.

12      THE COURT:  So you believe that Paragraphs 38, 39,

13 40, 41, if you also add Paragraph 8, are enough to satisfy due

14 process, specific jurisdiction?

15      MS. ANELLO:  Oh, I do.  I believe 38 through 42

16 without 8 is sufficient to satisfy due process, because the

17 minimum contacts and all of the various allegations throughout

18 the complaint regarding the foreign defendants' activities in

19 selling -- and I know they do it all, they do.  They're

20 involved in every aspect of something that's alleged in that

21 statement.

22      I'm -- and in the alternative, God forbid, if this

23 should actually -- if the jurisdictional discovery is

24 necessary, I'm not against it, because we know what the

25 jurisdictional discovery will show.  That's why the defendants

1    are against it.  It will show those allegations are valid, but

2    regardless --

3            THE COURT:  I don't think they're against it.  You

4    all have never asked for it.  And that's what he's saying.

5    He's not saying we don't want to -- he's saying you guys have

6    never asked for it.

7            MS. ANELLO:  That's because we believe our complaint

8    is sufficient on its face to allege personal jurisdiction.  If

9    that's -- they haven't submitted any evidence or anything else

10   to go to an evidentiary hearing, but we stand by our complaint

11   and don't think it's necessary.  I was just responding to the

12   last question that the Court asked that said do you believe

13   that jurisdictional discovery is necessary.  No, I don't.  I

14   think our pleadings are satisfied on all standards, including

15   due process, but if it's a last-ditch effort, last alternative,

16   I'm pretty confident what the discovery will show.

17           THE COURT:  Okay.

18           MS. ANELLO:  To be honest, Your Honor, my outline

19   basically goes through a lot of the stuff that's in my brief

20   that apparently you've already read.  Do you still want me to

21   go through that?  Is there something particular to address?

22           THE COURT:  I'm trying to see if I have questions for

23   you about those allegations being sufficient.  I mean, I'm not

24   sure that 8 adds much, because it says we derive -- you derive

25   goods in Georgia, including the scope and other similar scopes

1    and metal equipment -- medical equipment.  And so it's sort

2    of -- again, you're not there suggesting that there was

3    sufficient revenue in Georgia from the sale of this scope at

4    issue.  You're really saying that it could have -- this was, as

5    Mr. Charles was saying, that this was sort of a basket of goods

6    that led to significant revenue.  And I'm just wondering

7    whether that is enough.

8            MS. ANELLO:  Your Honor, throughout the complaint,

9    the allegations, just in general, about their manufacturing and

10   getting their product to the United States for use by hospitals

11   and physicians, including within the State of Georgia as having

12   the allegations there, and that they sold -- that they were

13   responsible for selling this scope to the plaintiff and the

14   hospital -- or that they were responsible for the scope used in

15   the procedure, coupled with all of the other allegations, I

16   think it's clear that they did derive substantial revenue from

17   the scopes.

18           And especially including their factual allegations,

19   36 also supports, at least with the Japanese corporation, that

20   they have approximately 7 percent of the global market for

21   gastrointestinal endoscopes and produces 85 percent of them in

22   the United States.  I think that also supports, as do the other

23   allegations set forth in the complaint.  But there was

24   something further under the factual allegations section.

25           THE COURT:  All right.  So let me read you, do you

1    have the *Brazil* case in front of you?

2            MS. ANELLO:  I had it.  They're -- I believe there

3    were two *Brazil* cases.  I have the July 2016 case.

4            THE COURT:  That's the one I have.

5            MS. ANELLO:  Okay.

6            THE COURT:  So let me just first ask you:  Do you

7    think that your allegations are enough to provide general

8    jurisdiction under the due process clause or are we talking

9    about specific jurisdiction?

10           MS. ANELLO:  We're dealing with specific

11   jurisdiction.

12           THE COURT:  Okay.  So if I look at specific

13   jurisdiction, it says:  Fair warning requirement is satisfied

14   if the defendant has personally directed his activities at

15   residents of the forum and the litigation results from the

16   alleged injuries that arise out of or related to those

17   activities.  Okay?

18           MS. ANELLO:  I'm sorry, what were you reading?

19           THE COURT:  I'm reading on page -- the end of

20   Page 1334 of the *Brazil* case under the part -- the Title 2,

21   period, specific jurisdiction.

22           MS. ANELLO:  I apologize.  I must have the wrong

23   page.  I have July 2016, but I don't have anything with -- I

24   begin at 1351.

25           THE COURT:  No, I meant March 2016.  I'm sorry.  Do

1    you have that one?

2              MS. ANELLO:  Yes.  13 --

3              THE COURT:  If you have the Westlaw printout, it's

4    probably Page 14.

5              MS. ANELLO:  No, we're a Lexus firm.  Sorry about

6    that.

7              THE COURT:  Look at the line that is at Headnote 14.

8    Do you see that?

9              MS. ANELLO:  Okay.  Yes.

10             THE COURT:  Okay.  But definitely the defendant must

11   purposefully avail itself of the privilege of conducting

12   business, that is purposefully establishing contacts in the

13   forum state and a sufficient nexus between those contacts and

14   the litigation.  Plaintiff relies on a stream of commerce

15   theory, which I think is what you-all rely on, because you

16   simply say if I look at those paragraphs, you say you put it

17   into the stream of commerce, okay?

18             Then you say that you get business in Georgia and

19   substantial revenue.  I'm not sure you've even alleged -- I'm

20   not sure that these allegations don't really sound general

21   jurisdictiony more than specific jurisdictiony.  But let me go

22   back to that case.  Because there you have to allege a nexus.

23   I don't see where you have alleged a nexus between these scopes

24   or the substantial business and the injury.

25             MS. ANELLO:  Oh, I think that takes up half of all

1  the complaints, a substantial nexus between the scopes, you

2  have Paragraph 8 discussing their substantial revenue from the

3  goods in Georgia, including the scope and other similar

4  Duodenoscopes which they manufacture, market, distribute and

5  sold.  They sold one of these scopes to the hospital at issue.

6  These defendants were aware of the defects in the scope, yet

7  failed to do anything about it and continued to sell it and it

8  was used in Ms. Quashie's surgery and has caused her injury.

9  The sales of the Duodenoscope --

10         THE COURT:  Let's go back to this, because I'm going

11  to try to address that issue.  If we go back to the case, you

12  know they talk about the *Nicastro* case, the plurality found

13  that these alleged contacts with the forum state, including the

14  sale of the one that caused the plaintiff's injury, did not

15  establish the defendant engaged in conduct purposely directed

16  at New Jersey to confer specific jurisdiction under the due

17  process clause.  Applying *Nicastro*, the district court at

18  *Webster* concluded first the jurisdiction was not permitted when

19  plaintiff has not alleged facts such as the volume of their

20  sales in Georgia or direct advertising of their products in

21  Georgia to suggest that ASI has purposely availed itself of the

22  benefit of Georgia laws.  Here plaintiff has not alleged any

23  fact that Defendant J&J purposely availed itself to the benefit

24  of Georgia law.

25         MS. ANELLO:  Right.  I'm sorry, can you repeat the

1   question?  I'm with you now.

2              THE COURT:  I'm just trying to say that I'm not sure,

3   and I'd like you to point me to your best case, that alleging

4   you sold a lot of scopes into the stream of commerce, that you

5   transacted business in Georgia and that you derived substantial

6   revenue from goods sold in Georgia and that the scope, this

7   type of scope was amongst the things that generated a

8   substantial amount of revenue.

9              MS. ANELLO:  I do say again in Paragraph 8 that this

10  scope was amongst the other medical equipment and other scopes

11  that generated the substantial revenue from goods used in

12  Georgia.  That's in Paragraph 8.

13             THE COURT:  Yeah.

14             MS. ANELLO:  The only thing in front of me -- I know

15  this is a lot and you're talking about specific jurisdiction,

16  again, those cases are dealing with a different legal standard,

17  because even in *Webster*, they had produced an affidavit saying

18  they don't have any sales.  And the Court wanted some more

19  specificity regarding volume of ASI sales, but was only

20  provided examples.  We talk about they were advertising in the

21  State of Georgia in Paragraph 38.

22             THE COURT:  Where do you say that?

23             MS. ANELLO:  38, advertising, marketing, promoting,

24  selling and distributing medical equipment into the stream

25  of -- into the stream of commerce used by the public, including

1   the plaintiff, and going on to the State of Georgia afterwards.

2   And then also referring -- again, I guess it's Paragraph 8 and

3   9, it's in a count, but that every time they created and

4   sold -- that each and every defendant here responsible for the

5   Q180V scope used in the procedure on Ms. Quashie.

6          THE COURT:  Yeah, but what if the scope was sold to

7   the hospital, a hospital bought it, a hospital group bought it,

8   McKesson bought it in Texas, right, and they send it to

9   Georgia.  All right.  That would be no contact to Georgia.

10         MS. ANELLO:  But I think here based on the

11  allegations, that's different.  We're saying they're selling

12  and distributing it directly to the State of Georgia, to the

13  hospital.

14         THE COURT:  Where do you say that this scope was sold

15  in the State of Georgia?

16         MS. ANELLO:  This particular scope?

17         THE COURT:  Yes.

18         MS. ANELLO:  89.  And that it was used in the ER

19  procedure performed on Plaintiff Quashie and then you go back

20  to the allegations that everything took place with Ms. Quashie

21  in the State of Georgia.

22         THE COURT:  Yeah, but that just means it was used in

23  the State of Georgia.

24         MS. ANELLO:  You said sold.

25         THE COURT:  Yes.  Where do you have an allegation

1  that this defendant sold it into Georgia?  Because this -- your

2  case is consistent with them selling it outside of the State of

3  Georgia and then the buyer bringing it into Georgia.

4         MS. ANELLO:  I will stand by the complaint and all

5  the allegations regarding personal jurisdiction read together

6  to support the allegations against the defendants that this

7  product, as well as other duodenum scopes, were sold within the

8  State of Georgia, such that they should have expected the

9  consequences to flow in Georgia.  That's why they haven't

10  produced any evidence, because they know the evidence supports

11  that.

12         THE COURT:  Well, I don't know -- I can't assume

13  that, that's obviously not something I can assume.  If I were

14  going to try to do that, I would look at the OMSC corporate

15  representative's affidavit in the Texas case, which says things

16  like they're not registered to do business in Texas; they do

17  not do testing in Texas; they do not sell any product in Texas,

18  or provide, repair and maintenance service in Texas; they don't

19  advertise in Texas; they do not contact Texas healthcare

20  providers for manufacturing service, sales or marketing of

21  medical equipment.  And that none of their websites that are

22  available -- that are accessible in Texas provide any goods or

23  services.  So, I mean, I don't know -- I can't assume that at

24  all, because, first of all, I can't, it's not in evidence, and

25  it just would not be fair.

```
1              MS. ANELLO:  No.  I mean, I understand that.  I'm

2      just saying I believe what's in the complaint, every allegation

3      in here, and we've discussed them, again, with two and

4      primarily the ones in the party defendants' section as well as

5      the factual allegations regarding what they do with the scope

6      and in selling it all supports that they had -- that minimum --

7      the due process aspect of the personal jurisdiction analysis is

8      satisfied.

9              THE COURT:  Um-hmm.

10             MS. ANELLO:  If you look at Paragraph 80, it's just

11     another example of an allegation where we discuss that they

12     have been promoting and advertising and selling their products

13     specifically to consumers, not simply that it was used but that

14     they were selling it to consumers, which included the

15     plaintiff, Caryl Quashie, and she's in Georgia.

16             THE COURT:  Where is this?  Which one?

17             MS. ANELLO:  Paragraph 80.

18             THE COURT:  80?  They sold their scopes to consumers;

19     is that right?

20             MS. ANELLO:  Right.  Well, no.  The consumers and

21     their healthcare physicians.

22             THE COURT:  The consumers are healthcare physicians?

23             MS. ANELLO:  Healthcare physicians.

24             THE COURT:  Which Ms. Quashie is not a healthcare --

25             MS. ANELLO:  No.
```

1          THE COURT:  Let me just read something.  Does anybody

2     here know, and I'm including Andrew Brown, my clerk in this,

3     does anybody know whether the Eleventh Circuit has adopted the

4     stream of commerce plus test or whether the Eleventh Circuit

5     still applies the stream of commerce test?

6          MR. CHARLES:  I am not confident, Your Honor, but I

7     know that the Supreme Court's recent decision in *Nicastro*, six

8     justices rejected the pure stream of commerce theory where

9     foreseeability alone was sufficient, putting a product into the

10    stream of commerce and foreseeing that it would end up in a

11    particular forum.

12         THE COURT:  Four rejected that?

13         MR. CHARLES:  The plurality clearly rejected that and

14    I think the two conferring justices also rejected that

15    foreseeability alone was sufficient and held that there had to

16    be the purposeful element.

17         THE COURT:  Yeah.  I have concerns now about the due

18    process level.  I will read the *Nicastro* case again.  But it

19    seems to me as though the most that can be said for the

20    complaint is that in regards to these two defendants, it

21    alleges placing something in the stream of commerce and that

22    there was otherwise business being done in Georgia.

23         I don't believe it alleges that there was knowledge

24    on behalf of the defendants that these items would be used in

25    Georgia or evidence that they were sold for the purpose of

 1  going into Georgia, in other words, I'm not sure that it would
 2  meet the stream of commerce plus test, for example, some
 3  evidence of showing that -- or some allegation showing that
 4  there was a purpose to serve the market in the forum state.
 5  For example, by designing the product for the forum state,
 6  advertising in the forum state, having channels to market and
 7  get customers in the forum state, have distributors who are
 8  targeting the forum state.
 9         I don't know that there's enough evidence here to
10  determine that the amount of money made was sufficient to
11  satisfy the minimum contacts.  I'm going to look at that again.
12  I don't know that there is anything else I want to hear about
13  it, but I have a higher level of concern over just these
14  allegations and even without a countering affidavit from the
15  defendant whether 38 through 41, even if you read into it
16  Paragraph 8, and even if you read at Paragraph 42, is enough to
17  satisfy the due process clause, to satisfy the due process
18  clause.
19         You know, there's an argument about each defendant
20  being a representative of the other defendant.  If there's
21  anything that you would like to say about that, Ms. Anello, let
22  me know.  It seems to me as though there is some level of more
23  specific pleading required to overcome the Eleventh Circuit's
24  repeated statement that entities that are separate are treated
25  separately unless you have some evidence of control by one over

1    the other.  And I don't think you have that here.  You

2    certainly have not alleged it.

3           MS. ANELLO:  We're not alleging control.  We

4    recognize that they are separate entities, however, as separate

5    entities, separate Olympus entities, they work together to do

6    everything that is alleged in the complaint:  Manufacture,

7    market and sell, whether directly or indirectly, they're all

8    working together.  If you look at their certificates of

9    service, they actually identify about 20 other more entities

10   that could potentially have an interest in this, all associated

11   with Olympus, that they felt that they had to include on their

12   certificate of interest -- or corporate disclosure statement,

13   whichever it is, because they are related entities.  But the

14   allegations are against them as separate and distinct entities.

15          THE COURT:  Okay.

16          MS. ANELLO:  The only thing I would like to add is I

17   would respectfully disagree with the Court's holding, I do

18   believe our complaint is sufficient enough to survive both

19   the -- I generally know it's a holding cap, the Court's -- my

20   reasoning.  I do believe it is sufficient to overcome the

21   minimum due process standards.  And to remember that this is

22   not something where the defendants just randomly got their

23   product to Georgia, it was fortuitous that they ended up in

24   Georgia.  In a lot of the cases they cite to, they do

25   discuss -- there are cases where there has been no contact with

1  Georgia, but like one circumstance that was completely

2  unrelated to confer jurisdiction, they're basically arguing

3  that we -- as manufacturer, distributor, labeler, advertiser,

4  promoter of the products, because they're in Japan, because

5  they put -- they put their product in the stream of commerce,

6  they know through their entities that are related to them that

7  it's going to get to places such as Georgia, and they're just

8  not going to be subject to the Court's jurisdiction.  And I do

9  believe that we have alleged enough to support that.

10         THE COURT:  But you haven't alleged that they made

11  this product knowing that it would get to Georgia and for that

12  purpose.

13         MS. ANELLO:  Is there anything -- I believe there

14  might be something in the -- let me find -- this is not the

15  complaint.

16         THE COURT:  Because that is more like the *Betancourt*

17  case where they looked at -- one of the things that they looked

18  at was -- it was one of their Ks, I don't know whether it was a

19  10K.  No, not the *Betancourt* case.

20         MR. CHARLES:  *Brazil*.

21         THE COURT:  Was it *Brazil* or *GenTran*?

22         MR. CHARLES:  *Brazil* was the 10K.

23         THE COURT:  Okay.  Right.  Oh, that's what the

24  defendant put forward for their 10K.  I'm thinking of another

25  one.  I'm thinking of -- give me a moment.  I'm thinking of the

1    *Betancourt* case where they use their annual report to show that

2    the defendant was complying with various local, state and

3    provincial regulations so that it could sell their products and

4    distribute their products there.

5         This says:  It is apparent that Patheon did not

6    simply place the birth control pills at issue in this case into

7    the stream of commerce with no idea of where they would be

8    marketed and/or sold, instead, Patheon actively manufactured

9    such pills for ultimate sale and consumption within the United

10   States, including the State of Georgia.  This is the type of

11   additional conduct that Judge O'Connor cited as sufficient to

12   satisfy the stream of commerce plus test for minimum context.

13        And they also had evidence that, for example, they

14   had -- there was an allegation that they had a sales team that

15   comprised 14 members that covers the United States.  At any

16   rate, I want to look at that a little more in the light of the

17   minimum contacts test and see whether I think you have

18   satisfied that.  I think defendant has conceded that if we are

19   allowed to simply accept the allegations in those paragraphs

20   that it meets the long-arm statute.

21        MR. CHARLES:  That's correct.

22        THE COURT:  But that it might not -- but they sort of

23   rely upon the minimum contacts.  Plaintiff concedes that

24   they're not looking for general jurisdiction, but rather

25   specific jurisdiction.  So I want to go back and review that

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1    case some more and I'll have to do that before we rule on

2    anything, okay?

3         Is there anything else, Ms. Anello, any other case

4    you want to cite on that fact or on that argument at all?  You

5    cited the *Black Box* case; is that right?

6         MS. ANELLO:  Yeah, the *Black Box* case.  And I know in

7    my brief I rely on the in re *Performance* case as well, it was

8    actually *Performance Systems Group, Inc*. 2012 U.S. District

9    Lexus 118725, but no --

10        THE COURT:  No.  Read me those again.

11        MS. ANELLO:  I'm sorry.  I talk fast.  I'm a court

12   reporter's nightmare.

13        THE COURT:  11725?

14        MS. ANELLO:  118725.

15        THE COURT:  Okay.

16        MS. ANELLO:  And if I could just look through my

17   notes real quick.  Nothing further for us on personal

18   jurisdiction.

19        THE COURT:  Okay.  So let's go to the next motion,

20   the 12(b)(6), and I'll give you just a jumping off point.  I

21   don't think I need to hear argument on the statute of

22   limitations.  I think that I have seen a case which says that

23   the date of the injury is really the date that the person

24   became sick rather than the date that they ate the meat.  Do

25   you know the case I'm talking about?

1          MS. ANELLO:  Um-hmm.

2          MR. CHARLES:  I'm not familiar with that case.

3          THE COURT:  I'm talking about, and you can look at

4   it, *Crook-Petite-El v.  Bumble Bee Foods*, it's 2017 Westlaw

5   3495924.  It's a June 2017 case in which they decided that the

6   claim accrued when the plaintiff became ill from eating the

7   tainted meat, rather than the date on which she ate the meat.

8   It's hard for me to believe that the statute of limitations on

9   Ms. Quashie could run in the seven days after the surgery

10  before she ever knew anybody had done anything wrong to her, so

11  I don't know if it's -- I haven't dug deeply into the discovery

12  rule and all of that, but -- and I don't know how an infection

13  begins.  I don't know whether an infection starts immediately

14  or whether it's there and your body can overcome it to a

15  certain amount and only when it gets to be a certain amount

16  worse your body can't overcome it itself and therefore it's

17  really the injury and the claim is when your body succumbs to

18  infection and it manifests.  I don't know.  I'm not a

19  scientist.

20          But it seems to me that the claim doesn't arise until

21  the 17th or the 24th, when she goes into the hospital and

22  begins to realize there's something wrong with her.  So I don't

23  need to hear any more about that.  I've read it.  I'll reread

24  the cases.  If I disagree with those cases, I'll let you know.

25          And I am concerned, and it's less for you than it is

1  for Ms. Anello that I'm not sure that they meet the pleading

2  standards here, particularly on fraud, of the who, what, when

3  and where, because I do think the general nature of it of sort

4  of saying everybody did everything is hard.  And I'm not sure

5  then it's even okay, because I still don't know what they said,

6  when they said it or who said it.  But if you want to talk

7  about that first, go ahead.

8        MR. CHARLES:  Yes, Your Honor.  I'll touch on, I

9  guess, two issues on the pleading standards.  But as a

10  threshold issue, the plaintiff filed an original complaint in

11 this Court that was substantially identical to the amended

12 complaint that she filed.  Defendants accordingly filed motions

13 to dismiss that are substantially identical to the motions to

14 dismiss that are now before you.

15        As the Eleventh Circuit said in *Eiber Radiology*, we

16 have never required district courts to grant counsel plaintiffs

17 more than one opportunity to amend a deficient complaint nor

18 have we concluded that a dismissal with prejudice is

19 inappropriate where a counsel plaintiff has failed to cure a

20 deficient pleading after been having offered ample opportunity

21 to do so.

22        So we would suggest that dismissal with prejudice is

23 appropriate here when the complaint does not state the claims

24 with a required level of either plausibility or particularity

25 as required under the relevant pleading standards.  The courts

1  in this district have done so in *Barnes* and in *Thornton* and in

2  a medical device case in *Nassar Cure* dismissed with prejudice

3  in a very similar procedural posture where the defendant had

4  brought a motion to dismiss, there was an amendment and another

5  motion to dismiss, and we'd suggest that that's the right

6  approach here, Your Honor.

7          THE COURT:  Which case is that?

8          MR. CHARLES:  *Eiber Radiology* is an Eleventh Circuit

9  case that discusses this and it says dismissal with prejudice

10  is the default.  And then the courts in this district in *Barnes*

11  and in *Nassar Cure* and in *Thornton*, all dismissed with

12  prejudice, very similar complaints that alleged products

13  liability cause of action.

14          THE COURT:  Okay.

15          MR. CHARLES:  Your Honor, I think you're absolutely

16  right about the fraud counts.  I'm happy to address any

17  particular issues you have about those, but I'll focus on the

18  product liability counts, because it seems like Your Honor

19  recognizes the problems with the fraud counts.

20          THE COURT:  Yes.

21          MR. CHARLES:  For the strict liability counts,

22  Your Honor, we'd suggest that there is one flaw that runs

23  throughout all of those, and that's a failure to allege

24  specific causation.  *Twombly* and *Iqbal* direct that the

25  formulaic recitation of the cause of elements is insufficient.

1    And here Ms. Quashie does nothing more to connect any product

2    defect to her infection than simply allege that it was the

3    proximate cause.  That is unsufficient.

4            The *Barnes* case, Your Honor, discusses the difference

5    between general causation and specific causation.  In *Barnes*,

6    the plaintiff had taken a prescription drug, that was Nexium in

7    that case, and the plaintiff said here's all this research

8    showing that Nexium causes kidney injuries.  I took Nexium, I

9    suffered a kidney injury.  The court said that's not enough,

10   that shows general causation between Nexium and kidney

11   injuries, but you haven't alleged specific causation.

12           Here Ms. Quashie hasn't alleged any facts to support

13   her causation allegations.  For instance, she doesn't allege

14   that the hospital took the scope out of commission after her

15   procedure.  She doesn't allege that it ever cultured positive

16   for any bacteria.  She doesn't allege there was an outbreak of

17   infections at Emory Johns Creek Hospital or, indeed, that any

18   other patients were infected.  In fact, she doesn't allege that

19   Emory Johns Creek Hospital is doing anything differently today

20   with regards to its ERCP and its scopes than it did on the day

21   that she had the procedure.  That's insufficient to support the

22   causation analysis, Your Honor.

23           Furthermore, *Twombly* and *Iqbal* direct this Court to

24   use common sense and judicial experience to determine whether a

25   complaint has raised the claim from the conceivable level to

1  the plausible level.  And it's common sense that infections

2  happen in hospitals.  Ms. Quashie's pure allegation that she

3  underwent a procedure on August 7th, she was diagnosed on

4  August 27th with an infection does nothing more than create a

5  conceivable or speculative guess that the scope was the cause

6  of that injury.

7         Your Honor, that affects all of her claims --

8         THE COURT:  How could she do more than that at the

9  pleading stage?  Right?  Doesn't that put you-all on notice as

10 to what the issue is?  She alleges she had a procedure, that

11 this scope was used in the procedure, that this scope has a

12 design defect that makes it harder to clean and that carries

13 microbial --

14        MR. CHARLES:  Contaminants.

15        THE COURT:  -- contaminants.

16        MR. CHARLES:  Sure.

17        THE COURT:  And that two weeks after it, she had an

18 antibiotic-resistant infection.  How is that not enough to put

19 you-all on notice as to what her claim is?

20        MR. CHARLES:  Your Honor, I think actually here

21 *Twombly* and *Iqbal* are instructive, not just for the holding,

22 but for their facts.  In *Twombly*, the plaintiff had alleged

23 that there was parallel conduct and then actually alleged that

24 there was an agreement.  And the court said even if that puts

25 them on notice of what's being alleged, they're being alleged

1  of engaging in a Sherman Act conspiracy to restrain trade,

2  that's not sufficient to raise from the conceivable level to

3  the plausible level, because it's consistent with lawful

4  conduct.

5          Similarly, *Iqbal*, the plaintiff had alleged that

6  there was unlawful discrimination under the First and

7  Fourteenth Amendments, specifically alleging that the attorney

8  general and the FBI director had developed a policy to detain

9  individuals of Muslim religion and target them based on their

10 national origin.  And the court in *Iqbal* actually looked at

11 alternative explanations and said it's far more likely to be

12 the fact that a substantial majority of the people detained

13 happen to be Muslim and happen to be of Middle Eastern origin

14 because the FBI director and the attorney general were

15 investigating the 9/11 terrorist attacks.

16         And so similarly here, Your Honor, it's far more

17 likely that the infection that occurred, occurred the same way

18 lots of infections occur in hospitals, and that's from other

19 transmission mechanisms.  She could have alleged facts to

20 support a causal inference, such as that there was -- there's

21 anything that's being done differently at Emory Johns Creek,

22 that was certainly within her ability to discover before

23 bringing this lawsuit.

24         THE COURT:  They do allege that your client has

25 changed the way -- that when they went back for FDA approval,

1  they changed the design of it because they became aware of the

2  problem.

3         MR. CHARLES:  Yes, Your Honor.  There has been a

4  design change, but she -- it doesn't link that design change to

5  what caused her problems.  She mentions the O-ring, that this

6  was -- there was a tighter variance for the O-ring.

7         THE COURT:  Right.  And she says you had one design.

8         MR. CHARLES:  Yes.

9         THE COURT:  Defendant became aware that there were

10  problems with this design.  When the FDA came around, they

11  changed the design to do away with this problem.

12         MR. CHARLES:  Yes.  And that -- that, to me, would be

13  the same as a general causation in *Barnes*, that there's this

14  drug, Nexium, that if the FDA comes around and says this is

15  causing too many kidney injuries and the defendant then changes

16  the chemicals in the Nexium, that's general causation.  It

17  doesn't link this particular scope to an infection with

18  Ms. Quashie.

19         It would be more likely, and a much harder case, if

20  there had been, say, 12 patients who were alleged that they

21  were infected at Emory Johns Creek Hospital.  But it's common

22  sense that, one, infections happen in hospitals, and two, this

23  scope was likely used in other patients and nobody else has

24  come forward and said they were infected as a result of a

25  procedure at Emory Johns Creek Hospital, making it less likely

1  that the scope is the explanation.  And that's what *Iqbal* says

2  that this Court ought to do is look at conceivable --

3  alternative explanations and see if they're as consistent with

4  the allegations as the one that plaintiff made.

5          THE COURT:  Would it be enough if she alleged that

6  she got the infection from this scope?

7          MR. CHARLES:  It might be --

8          THE COURT:  Doesn't she allege that?

9          MR. CHARLES:  I'm not entirely clear, Your Honor.  I

10 don't think she alleges that this scope had on it microbial

11 contaminants as a result of any of the defects that she

12 identifies.

13         THE COURT:  Would it be enough if she said that?

14         MR. CHARLES:  If she said that this particular scope,

15 yeah, had on it contaminants, that she had the procedure and

16 that those contaminants were transferred to her.  I think that

17 would be sufficient, Your Honor.  But it's important to note

18 that --

19         THE COURT:  All right.  Well, hold on.  I didn't mean

20 to set a trap on you.

21         MR. CHARLES:  Okay.

22         THE COURT:  Because Paragraph 15, it says:  Quashie

23 was caused to suffer this life-threatening,

24 antibiotic-resistant infection as a result of defendants' scope

25 that was used during the aforementioned procedure.

```
 1              MR. CHARLES:  Yes, Your Honor.  But in that
 2    paragraph, there's no identification of what defect she's
 3    alleging caused the problem.  She identifies a couple of
 4    different kinds of defects, maybe it was the O-ring or maybe it
 5    was an insufficient cleaning protocol.  She doesn't allege what
 6    kind of defect caused these injuries.
 7              And these are the same arguments, Your Honor, that we
 8    made as to the original complaint.  And there aren't any more
 9    allegations to suggest that she has connected the scope
10    causally to her infection.
11              THE COURT:  Was the initial complaint and motion to
12    dismiss ruled on?
13              MR. CHARLES:  No, it was -- I think it was withdrawn
14    or moot by consent.  I'm not entirely sure.
15              THE COURT:  Because the amendment came down in time?
16              MR. CHARLES:  Yes.
17              THE COURT:  Okay.  Anything else you want to say
18    about that?
19              MR. CHARLES:  No, that's it, Your Honor.
20              THE COURT:  Okay.  And I should look at the *Eiber*
21    *Radiology*, *Barnes*, *Thornton* and *Nasser* cases?
22              MR. CHARLES:  Yeah, *Nassar Cure* and *Barnes* and the
23    *Thornton* case, too, Your Honor, and the *Nexium* case.
24              THE COURT:  Okay.  Okay.
25              MR. CHARLES:  Thank you.
```

1          MR. SMITH:  Your Honor, my colleague, Diana

2    Yastrovskaya -- pronounce that -- will be arguing in response.

3    I just wanted to say regarding the amendment of pleadings, we

4    pled initially as an amendment, as a right, and stand by our

5    pleadings as they are today.  But the amendment of pleadings

6    should be given liberally, and even a lot of the case law cited

7    by the defendants allow for the amendment of pleadings before

8    an automatic dismissal with prejudice.  So we would ask that we

9    be given leave free to amend.

10         THE COURT:  I understand.  And I am concerned that

11   your -- the way that you-all pled to try to keep all the

12   defendants in it --

13         MS. ANELLO:  I'm sorry, I missed that.

14         THE COURT:  I'm concerned that the way that you pled

15   it, in an effort to keep all of the defendants in the case, has

16   caused some of the problems in your 12(b)(6) pleadings.  But

17   I'm not -- that might come out as I speak with

18   Ms. Yastrovskaya.  Go ahead.

19         MS. YASTROVSKAYA:  Basically, Your Honor, the

20   defendant -- we pled that not only was the scope defective, but

21   we also pled how it was defective.  Basically, there could be

22   more than one allegation of defect and there could be more than

23   one defect playing together, like, for example, the O-ring that

24   allowed leakage and the small crevices together, the bacteria

25   could leak into the crevices and that it hadn't been properly

1   cleaned.

2          Additionally, the improper reprocessing instructions

3   which didn't provide proper guidance for the cleaning process

4   could have also played into the defect and into the infection

5   that Ms. Quashie suffered.

6          THE COURT:  You can't possibly know more than that.

7          MS. YASTROVSKAYA:  Exactly, at this stage.

8          THE COURT:  It seems unfair to require more than

9   that, Mr. Charles, when they do allege, like she says, three

10  things:  Really small crevices, a leak, a leaky O-ring and poor

11  instructions on how to clean it.  How can they do more than

12  that?  And you can have your chance to respond to that.  I'm

13  not going to interrupt you.  Go ahead.

14         MS. YASTROVSKAYA:  Basically, yeah.  So plaintiff did

15  adequately allege there was a defect and this is the defect

16  that caused her infection.  And she also alleged that she

17  suffered a life-threatening antibacterial infection, which she

18  was hospitalized for.  So because of that, it's our position

19  that the complaint adequately sets forth the claims of design

20  defect.

21         THE COURT:  My concern on the defect claims, I have a

22  series of concerns on what I'll call the strict liability

23  claims and maybe the negligence claims and then the -- as

24  opposed to the fraud-based claims.  So there's three that fall

25  under the normal standard and four that fall under the

1  heightened pleading standard, I think.

2          But, again, I keep going back to the *Brazil* case.  If

3  you look at that case where they get into -- where it talks

4  about whether it's a shotgun pleading, and defendants are not

5  arguing now it's really a shotgun pleading, but they do allege

6  that there are -- the defendants are all thrown in it together.

7  And the pleading mistake where -- this is on Page 16, my

8  Page 16, it's under the part entitled strict liability.

9          MS. ANELLO:  Your Honor, there's a March 2016.

10          THE COURT:  The March one.

11          MS. ANELLO:  Thank you.

12          THE COURT:  What does the July one address?  Is it a

13  subsequent motion to dismiss?

14          MS. ANELLO:  It was a subsequent motion to dismiss

15  where some were allowed and some were not.

16          THE COURT:  Okay.  Okay.  This one, this concerns me

17  that in this case, the plaintiff alleged that the defendants

18  designed, researched, manufactured, tested, advertised,

19  promoted, marketed and sold, blah, blah, blah, blah, blah,

20  Invokana.  That's a lot like your allegation.  Your allegation

21  in -- throughout it where you identify the parties you-all say

22  that the defendants did this.  You have the same allegation

23  against each defendant.

24          And what he says is, he cites another case, the

25  *Henderson* case, third, plaintiffs failed to distinguish between

1 defendants or to specifically allege whether Defendant Caraco

2 and any other defendant is a manufacturer, distributor,

3 supplier or seller of the product at issue.

4          So my concern there is -- and it goes on:  Plaintiff

5 does not distinguish between any of the defendants, it said:

6 Plaintiff's allegations are largely legal conclusion which are

7 not sufficient to meet the *Twombly/Iqbal* standard.

8          My concern is that I don't know which defendant you

9 believe did these things.  And I think that -- I think that

10 that's a pleading deficiency.  And it goes on, on the

11 negligence one to say, again, plaintiffs did not specify how

12 any specific defendant breached any duty.  Plaintiff's lack of

13 specificity as to the acts of any specific defendant fails to

14 provide proper notice of her claims to any one defendant.

15 Plaintiff may use alternative pleading, but greater factual

16 specificity is necessary.

17          And my concern is that the way you-all have pled it

18 in a group of defendants, that everybody did everything

19 together, is insufficient to state a claim against any specific

20 defendant.  Can you talk to me about that?

21          MS. YASTROVSKAYA:  At this stage, Your Honor, in the

22 proceedings, it's our allegation that they all worked together,

23 that each defendant worked with each of the other defendants

24 together to market and promote and distribute and sell this

25 product into the stream of commerce and it had the defect that

1  we allege, either the design defect or failure to warn or it

2  was negligently designed and manufactured.  They all -- each

3  and every defendant worked together, and even though they are

4  separate entities, they are related and they were involved in

5  the process of developing and marketing and distributing and

6  manufacturing these scopes together.

7       THE COURT:  So which one do you believe designed it?

8       MS. YASTROVSKAYA:  At this point, we believe that

9  each had an input in the design.

10      THE COURT:  And which one manufactured it?

11      MS. YASTROVSKAYA:  We know that it's the Japanese

12 defendant that manufactured it, but again, all four had input

13 as to how it was manufactured, what information they chose to

14 disclose, what information they chose not to disclose in the

15 label or in their reprocessing instructions.

16      THE COURT:  And which one of them sold it?

17      MS. YASTROVSKAYA:  Again, they all had an

18 involvement, they all had a part in the sales process in --

19      THE COURT:  I'm just not sure that that's enough.  I

20 mean, because in the end what you're going to do when you get

21 down to summary judgment is you're going to allege we've pled

22 every one bought and sold and manufactured and promoted and

23 designed, and therefore, it's okay for us to go after this

24 defendant now on this theory and this defendant now on this

25 theory.  And I'm not sure that that's what *Iqbal* allows.  I'm

1  concerned that under *Iqbal*, you have to be more specific with

2  these defendants as to what you believe each one of them did.

3  Because are you really alleging that each defendant

4  manufactured this?

5          MS. YASTROVSKAYA:  Yes, Your Honor.  We are alleging

6  that each defendant had a part in the manufacturing process.

7          THE COURT:  That's not my question.

8          MS. YASTROVSKAYA:  And had a decision-making part in

9  the manufacturing.

10          THE COURT:  So you believe that the Canadian -- the

11  entity that was selling, responsible for sales in Canada, the

12  U.S. and Mexico --

13          MR. CHARLES:  Latin America.

14          THE COURT:  Latin America.

15          -- was manufacturing this product?

16          MS. YASTROVSKAYA:  We believe that they had an input,

17  a say as to how these products would be manufactured.

18          THE COURT:  Okay.  What does that mean?

19          MS. YASTROVSKAYA:  That they were decision makers in

20  the manufacturing process.

21          THE COURT:  In what way?  Because I'm not sure how

22  they can defend themselves until they know that.

23          MS. YASTROVSKAYA:  Okay.  Your Honor --

24          THE COURT:  Are they getting input or are they -- do

25  you see what my issue is?

```
1          MS. YASTROVSKAYA:  I do, Your Honor.  It's just for
2   the purposes of Rule 8(a) at this stage of the proceedings
3   defendants have fair notice of what the claims are and the
4   grounds upon which they rest, so --
5          THE COURT:  Yeah.
6          MS. YASTROVSKAYA:  -- going forward at summary
7   judgment, there will be a different standard where we will have
8   to show how each defendant was involved in the manufacturing or
9   the design process.  But at this stage of the proceedings,
10  there's fair notice to the defendant, to all four defendants as
11  to what the claims are against each one of them.
12         THE COURT:  I mean, you may be right.  I mean, your
13  case is a little different than some of the others in that your
14  overarching allegation is more finite than in some of these
15  other cases.  But I remain concerned, and I'll have to go back
16  and look at some of those, that the language I read you out of
17  the Brazil case would apply here as well.
18         I mean, you're sort of saying that your claim against
19  each defendant would be the same if they were the only
20  defendant here, right?  In other words, you would be saying
21  that this defendant did each one of these things and that the
22  next defendant did each one of these things.  Right?  That's
23  essentially what you're saying?
24         MS. YASTROVSKAYA:  Exactly, Your Honor.  And I think
25  it was in one of the footnotes.
```

```
 1            THE COURT:  So, Mr. Charles, I'd like to hear your

 2   thoughts on that as well, because, you know, if there really is

 3   a claim that defendant one did all of these things and

 4   defendant two did all of these things, then maybe the general

 5   allegation of all defendants is not the same error that the

 6   court found in the Brazil case.  I don't know whether that

 7   affects what they can do at summary judgment or whether they

 8   can get to summary judgment and then break it out into, well,

 9   this one, this defendant manufactured, this defendant marketed,

10   this defendant designed.  So when we get back to you, I'd like

11   to hear that.

12            MR. CHARLES:  Yes, Your Honor.  I think you're right

13   to point out the concern that the Brazil court raised, and

14   certainly I don't think the Brazil court would have accepted a

15   response as sufficient from the plaintiff that were alleging

16   everybody did everything as the plaintiff seems to suggest

17   here.  But they also said that they don't really think that

18   everybody manufactured, they just think everybody had some

19   input into the manufacturing process.

20            THE COURT:  Right.  And I'm going to come back to

21   that in a minute.  But I'm not sure that's not enough.  I'm not

22   sure that what Ms. Yastrovskaya --

23            MS. YASTROVSKAYA:  Yastrovskaya.

24            THE COURT:  Yastrovskaya.

25            -- said is they all had input in that.  What she
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  didn't say is, no, no, one designed, one sold, one marketed.

2  She said that this one was responsible for the design by input

3  or the manufacturing by saying what should be done, that seems

4  different to me than what I thought, which was that there would

5  be an admission that there was a design and a manufacturing and

6  a marketing and sales.

7          So maybe -- but I'll get back to that in a minute.

8  Can you talk to me about the fraud claim, because my

9  understanding of the fraud claims is a higher level of who,

10  what, when and how.  And I see your general allegations that

11  they said it was superior, they said it wouldn't contaminate,

12  they said it was safe and all of those things were false.

13         But what I want to know is if any of these fraud

14  cases mean anything, what they say is you have to allege the

15  who, what, when and where.  And I don't have a single date, I

16  don't have a single statement.  I have a general description of

17  the statements rather than something that is like on this day,

18  they put out a press release that said this or this defendant

19  said this in marketing materials or anything like that.  And I

20  think that's what you need for fraud.

21         MS. YASTROVSKAYA:  Just one moment, Your Honor.

22         THE COURT:  Sure.

23         MS. YASTROVSKAYA:  Okay.  Your Honor, as far as the

24  who -- again, we allege that it was each and every defendant.

25  The when, generally, it was between 2015 -- 2010, when the

1    defendants first began to market the Q180V scope to August of

2    2015, when the plaintiff had her surgery.  Throughout the

3    complaint, we also allege that by May of 2012, defendants were

4    aware that their design of the scope was defective, and that it

5    allowed for the retention of the microbial contamination.  But

6    they failed to notify the FDA.  By autumn of 2012, the

7    defendants knew that the Q180V scope was linked to outbreaks of

8    dangerous infections, this is 67, 68, 69, 70, so we do have

9    some particular dates on which the defendants became aware of

10   the infection in both the United States and Europe and failed

11   to notify the FDA.

12          Additionally, defendants throughout their media

13   advertisement in the defective reprocessing instruction and in

14   the label, which lacked the warning about the bacterial

15   contamination, that's where, you know, they fraudulently claim

16   that the scope was, in fact, safer and would not be spreading

17   infection.

18          THE COURT:  You actually refer to the label?

19          MS. YASTROVSKAYA:  I believe so, yes.  One minute.

20   If you go to 184 through 185 and 188, the information

21   distributed to the public, the FDA and the plaintiff by each

22   and every defendant intentionally included representations that

23   the Q180V scope was safe and effective for its intended use,

24   and that information does include the label as well as the

25   advertising materials.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1          THE COURT:  Which paragraphs again?

2          MS. YASTROVSKAYA:  I believe it's 184, 185, 188.  We

3     allege the defendants intentionally distributed false

4     information to plaintiff's doctors, hospitals and healthcare

5     professionals as well as the FDA.

6          THE COURT:  Does it mention a label?  Because if we

7     just look at these allegations, distribute false information

8     assuring the public that the scope was safe and effective,

9     omitting certain test results -- for your information, this is

10    187 -- to the public, the FDA and the plaintiff by press -- by

11    reports, press releases, advertising campaigns, print ads,

12    magazine ads and all other commercial media, contained material

13    representations of fact and/or omissions.  I think that falls

14    squarely under the guidance that the Eleventh Circuit has said

15    that you have to provide information as to what those

16    allegations are, when they were made and who made them.

17          Unless you're really arguing here that all three

18    defendants or all four defendants said it at the exact time,

19    that doesn't pass the straight face test to me.  You might be

20    able to say they all were involved in manufacturing, but

21    there's no way they all made a statement at the same time.  And

22    so, for example, what press release are we talking about?  What

23    report?  What advertising campaign?  What print ad are we

24    talking about here that contains a false statement?  You

25    can't -- how can that be assessed with a heightened pleading

1  standard unless those items are identified?  That really runs

2  to the heart of my concern on this.

3           MS. YASTROVSKAYA:  And those statements particularly

4  were made on the defendants' website and, again, it's our

5  position that all the defendants had an input as to what was

6  going to be distributed regarding the safety of the scope.

7           THE COURT:  Wait.  What claims were put on the

8  website?

9           MS. YASTROVSKAYA:  Their press releases were on the

10 website, the copy of the label is typically on the website, any

11 information regarding the safety of the scope, its reprocessing

12 instructions would be on the website.  And even though each

13 defendant didn't simultaneously make those statements, again,

14 it's our belief at this stage that all -- all four defendants

15 had an input as to what information was going to be distributed

16 to the public, to healthcare professionals and to what was

17 going to be given to the FDA.

18          THE COURT:  Right.  Even if that's true, I think you

19 have to say -- I don't think giving a one-year window is

20 enough.  If you look at cases like the *Tri-State Consumer*

21 *Insurance Company v. LexisNexis*, I think it's a Judge Batten

22 case, 823 F Supp. 2d 1306.  In there, it was like a year, false

23 statements made during this year period.  He said that's not

24 enough to satisfy Rule 9's requirements.  And what you-all have

25 posited to me is a five-year timeframe when the defendants said

```
 1  things on websites, press releases, labels, none of which I
 2  can -- none of which they can say and go defend.
 3          It just seems to me as though you guys traveled
 4  pretty far under the general allegation, but when you bring a
 5  fraud claim, I think that's the -- I think that's a bridge too
 6  far for the generality.  And I'd like to know if you have a
 7  case.  I don't know that we need to have much more argument on
 8  it.
 9          MS. YASTROVSKAYA:  No, Your Honor, we don't have
10  another case at this time.  We ask for leave to amend the fraud
11  complaint.
12          THE COURT:  Did you ask for that in your pleading?
13          MS. ANELLO:  Yes.
14          MS. YASTROVSKAYA:  I believe so.
15          MS. ANELLO:  At the very end, the very last page.
16          THE COURT:  Okay.
17          MS. YASTROVSKAYA:  Yes, on Page 25.
18          THE COURT:  Yeah, I see it.  Okay.  Okay.
19          Mr. Charles, anything you want to say in that regard?
20          MR. CHARLES:  Yes, Your Honor.  Two points there.  On
21  the leave for amend -- to amend.
22          THE COURT:  That's really my issue, because I --
23          MR. CHARLES:  Yes.
24          THE COURT:  -- don't think this case -- I don't think
25  this complaint comes close to the 9(b), and I've got to look at
```

1  the non-fraud-related claims a little more carefully and see if

2  I think you get there on that.  I need to pull apart a little

3  bit the cases that talk about grouping defendants.

4          The 9(b), if it means anything, it means telling who

5  said what when.  And I don't think that a general claim that it

6  was alleged to have been safe is really enough for that.

7          MR. CHARLES:  And, Your Honor, I would suggest that

8  we raise the same argument to the original complaint, and it

9  was not amended to satisfactorily comply with Rule 9(b).  And

10 as Your Honor suggests, a five-year window, ten different

11 categories of places where misrepresentations could be made

12 doesn't come close to meeting Rule 9(b).  They didn't correct

13 it.  They shouldn't be given another chance to do so.

14         The Eleventh Circuit's decision in *Posner* also

15 suggests that merely raising an argument for leave to amend in

16 response of pleadings is not sufficient to raise it under

17 Rule 15.  They haven't filed a brief or a motion requesting

18 that with factual support and we think it would be futile here

19 under the circumstances.

20         THE COURT:  But that's different.  Would it be

21 futile?  I mean, because what they've said is, for example,

22 there is a label and there was a press release and there was

23 something on a website.  I'm not sure that they've conceded

24 that this is all they can allege.

25         MR. CHARLES:  That may well be, Your Honor, that they

```
1    haven't conceded that.  But I think that's a separate point, is
2    that it's futile.  But, first of all, that they shouldn't be
3    allowed to do so because they didn't change it at the time.
4    And as the courts in this district have done, that merits
5    dismissal with prejudice, and they haven't properly asked for
6    leave to amend in this case, it's significantly far advanced by
7    this point already.
8           If Your Honor would allow it, I can touch on some of
9    the Twombly and Iqbal claims about the strict liability, back
10   to those.
11          THE COURT:  Sure.
12          MR. CHARLES:  I think Your Honor's concern about
13   failing to identify specific defendants with specific conduct
14   is well founded.  The Court in the Henderson case, for example,
15   found insufficient where the plaintiff had, quote -- or failed
16   to, quote, allege any relationship between a specific
17   defendant, a specific breach and a specific end group.  And
18   that was insufficient under Twombly and Iqbal.  Similarly,
19   here, there's not the relationship between a specific breach
20   and a specific defendant that caused Ms. Quashie's injuries.
21          And that's important for the strict liability claims,
22   because under Georgia law, only the manufacturer can be
23   strictly liable.  This is the Georgia Court of Appeals'
24   decision in Alltrade under the statute which is -- I can give
25   you the exact site 51-1-11, I believe, and 11.1 says:  Product
```

1   sellers are expressly not strictly liable, so it matters who's

2   doing what conduct.  And simply saying all of them had some

3   input into the manufacturing process is not what the standard

4   is for who can be held liable as a manufacturer.  The Georgia

5   Court of Appeals in *Davenport* said there's a different standard

6   for who was a manufacturer under the law.

7           Similarly, Your Honor, the failure to warn --

8           THE COURT:  Yeah, there's three different standards.

9   I forgot to ask her about that.  You raised that point in your

10  brief, right?

11          MR. CHARLES:  That there's a separate standard, yes,

12  Your Honor.

13          THE COURT:  There are really three different

14  standards depending on whether you are the manufacturer or the

15  distributor or the seller or something like that.  Yeah.  Okay.

16          MR. CHARLES:  And similarly under the failure to warn

17  claim, there is separate obligations on the manufacturer and

18  the seller manufacturer has a continuing duty, the seller has a

19  different duty, so the failure to distinguish among the

20  defendants and describe which one did what, it's fatal to those

21  claims.

22          And it's not sufficient under *Twombly* and *Iqbal*,

23  which require plausible pleadings to say simply that four

24  separate defendants who we recognize are unique and different

25  from each other did all of these actions all together.  That is

1  not plausible and this Court need not accept that allegation on

2  its face.  That's what the *Brazil* court said, just because

3  you've alleged that everybody was involved in every activity,

4  they don't have to accept that as true, that's not plausible

5  where there's a recognition that two of them are in Japan.

6  There's an allegation that there is a parent company overseas,

7  other entities, it's not plausible to suggest that everybody's

8  doing everything and those different roles matter for the

9  elements under Georgia law.

10         THE COURT:  Okay.  Anything else?

11         MS. ANELLO:  I was supposed to argue the shotgun

12  pleadings, and that's actually why I kind of want to turn back

13  here, because their shotgun pleadings argument mainly dealt

14  with the naming of the additional defendants.  There's a

15  different standard, I believe, with respect to amending when

16  that particular issue is a shotgun pleadings, as they're

17  arguing.

18         And I would refer back to the particular case that

19  they cited as well, *Kreiger*, where it's saying the appropriate

20  relief -- like dismissal for such a type of pleading, the

21  appropriate relief is not -- excuse me.  Let me try that again.

22         The appropriate relief is not dismissal because that

23  is a drastic sanction.  Unless there is some kind of

24  showingness or willfulness or bad faith on the part of the

25  plaintiffs, then they should be -- the remedy should be either

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  leave to amend or the flagging of a more definite statement, so

2  I just wanted to throw that out, that that's a little different

3  standard than the Rule 15, the rule amendment standard.  Thank

4  you.

5          THE COURT:  All right.  I need to -- I'm not sure

6  that that carries today, because that's not everything,

7  especially on the fraud claims.  I need to look at what the

8  rules are on the leave to amend.  I don't believe you're in a

9  situation where you cannot -- where amendment would be futile,

10  it does not seem that way to me.  I may be wrong, but it seems

11  to me as though part of the reason -- if there was a tactic to

12  it, maybe the tactic was that it helps on the motion to dismiss

13  for personal jurisdiction to have everybody lumped together,

14  but then that comes back to haunt you on the sufficiency of the

15  allegations.  I don't know.  But I have to look at that.

16          It seems to me as though there ought to be leave to

17  amend.  And I think that's what the court did in the *Brazil*

18  case.  And I grant -- I grant that there has already been one

19  free amendment here, but I'm looking at *Brazil* for a lot of

20  other reasons.  I see a lot of similarities here.  And he

21  allowed them to amend in that case, so I'm going to look at

22  that a little bit more, okay?

23          Anything else anybody wants to say before I do an

24  order?

25          MS. ANELLO:  Nothing with respect particularly to

1  this motion.  But an outstanding issue that we had emailed the

2  Court about regarding discovery as to the Japanese defendants.

3  THE COURT:  Well, I don't know that I read the email,

4  but I do understand that the Japanese defendants are not

5  providing the discovery until -- because they're claiming there

6  is no jurisdiction and maybe they're afraid that if they

7  participate in discovery, that will subject them to

8  jurisdiction; is that right?

9  MR. CHARLES:  Yes.

10  MS. ANELLO:  Yeah.  I've always respected their

11  position.  And I think all the parties were hopeful that we

12  would have a decision before now.  But the reason it's now come

13  to the Court's attention so quickly is that plaintiff's expert

14  reports are currently due on June 6th, and it's very difficult

15  for us to have our experts proceed with the liability and get

16  our tort reports ready when we have no discovery from the

17  defendants if they're still left in the case.

18  And we moved to compel to get discovery from the

19  defendants, because they still are in the case, and they have

20  moved to stay.  It's technically their burden to move to stay

21  once we serve our discovery demands and they were just never

22  responded to, but as our deadlines loom, we need guidance from

23  the Court regarding this discovery issue.

24  THE COURT:  Is there any legal impediment to them

25  raising a jurisdictional issue if they engage in discovery?

1          MS. ANELLO:  They cited to a Fifth Circuit case that

2     says when you engage in discovery -- and I'm not sure, they can

3     respond better, but when you engage in discovery, you waive

4     your right to jurisdiction.  Plaintiff would agree, on the

5     record, right before the Court to stipulate that in no way we

6     would make that argument if we could get discovery from them,

7     just to get the ball rolling to meet deadlines and not have

8     everything drag out.  But as for the Eleventh Circuit, I'm not

9     sure what that argument is, which is why we believe that we

10    served discovery as party -- you can't just unilaterally say

11    I'm not serving discovery.  They should move for a stay under

12    the terms of the -- under the law of the Eleventh Circuit or

13    whatever law they deem fit.

14          THE COURT:  Okay.  Mr. Charles?  Is there another

15    reason they don't want to engage in discovery?

16          MR. CHARLES:  Yes, Your Honor.  And that's that

17    they're not subject to personal jurisdiction here.

18          THE COURT:  Yeah.

19          MR. CHARLES:  And I'm not aware of any cases, and

20    certainly none were cited in the email, where a party that had

21    an objection outstanding to personal jurisdiction was ordered

22    to engage in not just jurisdictional discovery but merits-based

23    discovery, which was the discovery that was served on these

24    entities.  As Your Honor knows, there are some case where

25    there's jurisdictional discovery appropriate and there is, for

1 | instance, an affidavit, but I'm not aware of any cases that
2 | have been cited where there is merits-based discovery with a
3 | pending Rule 12(b)(2) motion.
4 | THE COURT:  I regret that we are in this spot.  I
5 | have concerns about the jurisdiction over the two Japanese
6 | companies.  If we were to find out that Olympus Corporation
7 | were simply a holding company, I don't know if that's true or
8 | not, I haven't looked at anything about them, that would fall
9 | under a couple of cases that I have seen that would suggest
10 | there's no jurisdiction.
11 | As I said before, I have some concerns about whether
12 | or not the pleadings are sufficient.  I didn't coming in, but
13 | defense counsel has convinced me that there might be an issue
14 | about the due process.  And I understand a foreign
15 | corporation's desire not to engage in discovery in a case where
16 | they don't have -- where they're not subject to jurisdiction.
17 | And I am new at this, but I believe very strongly in my heart
18 | that we are courts of limited jurisdiction, and so I'm not
19 | about to overreach in trying to order somebody to engage in
20 | discovery.
21 | So absent evidence that I can compel a foreign
22 | corporation that raises a discovery -- I mean a jurisdiction
23 | issue to engage in discovery while that jurisdictional issue is
24 | pending, I'm not going to do anything to force them to engage
25 | in discovery.  I understand maybe it could have been brought up

1 a different way, but I'm not going to make a decision based

2 upon the process of how we got here on something that is near

3 and dear to me as the limited nature of the Court's

4 jurisdiction.

5       MS. ANELLO:  And I respect the Court's finding.  And

6 as I mentioned, the reason that I'm bringing this up has to do

7 with a pending deadline that is upcoming for the plaintiffs for

8 experts.  How can we serve experts without discovery or knowing

9 where we're at with respect to the Japanese defendants?

10       THE COURT:  So is the other discovery proceeding

11 well?

12       MS. ANELLO:  It is proceeding well, but even that

13 discovery on its own would require this extension.  And I'll

14 kind of try and give you -- so far, they have served us with

15 over 700,000 pages of documents that we are currently trying to

16 sift through and review.  And my understanding, they can

17 represent it better, is that these are -- there are other

18 actions that have been filed against them across the country,

19 and there -- and I believe we mentioned to the Court that

20 there's California, JCCP or consolidated litigation, back in

21 March, there were 29 actions, there may be more, and discovery

22 is ongoing there as well.

23       My understanding is that I have been produced

24 discovery that was produced in other litigations, not only the

25 JCCP, but other actions that were filed against the defendants,

 1    and that this should be -- and I'm just using quotes for, like,

 2    general discovery, but they're still needing to produce to me

 3    discovery specific to the defendant -- U.S. defendants, when I

 4    say discovery, the U.S. defendants' discovery as to the

 5    hospital and some of their employee there, and depositions

 6    still need to be taken once the discovery comes in.

 7            So it's moving and there has been substantial

 8    discovery.  Plaintiffs depositions are scheduled the week that

 9    our expert reports are due, the day of.  And the hospital, we

10    had served a subpoena on the hospital and got a response.

11    Defendants served a subpoena on the hospital and got a

12    response.  We're currently looking through those responses and

13    it's very likely within the next month or so we'll be having --

14    subpoenaing hospital employees for depositions.

15            THE COURT:  When does discovery close?

16            MS. ANELLO:  Expert discovery -- excuse me.  I have

17    it in front of me.

18            MR. CHARLES:  August 20th.

19            MS. ANELLO:  Thank you.  That's all discovery.

20            THE COURT:  That's all discovery?

21            MS. ANELLO:  Right.

22            THE COURT:  And when are the experts reports due?

23            MS. ANELLO:  June 6th is when plaintiff's expert

24    report is due.

25            MR. CHARLES:  And July 9th is defendants'.

1          THE COURT:  And what you're saying is you can't --

2    you need more discovery from the foreign companies to finish up

3    your expert report?

4          MS. ANELLO:  Yes, as well as additional discovery,

5    what's remaining from the U.S. entities as well.

6          THE COURT:  Okay.  So why don't we -- is there any

7    reason that the expert reports can't be due 30 days after the

8    close -- or at the time discovery ends?

9          MS. ANELLO:  I'm sorry, so August 20th?

10         THE COURT:  Why do we have to do more than extend the

11   time for the expert reports?

12         MS. ANELLO:  Because the scheduling report

13   specifically just says that the actual reports are due by June

14   6th.

15         THE COURT:  Right.  Couldn't we just extend the

16   expert time to be at the same time that discovery closes?  What

17   does my standing order say on that?

18         MS. ANELLO:  I have it.  It's somewhere here.

19         THE COURT:  Let me look at it.  I don't think it says

20   anything other than you guys get to decide.

21         MR. SMITH:  My quick review says the same, Judge.

22   And your solution is certainly amenable to us.  I think we need

23   a unique posture.

24         MR. BEAULIEU:  Your Honor, this is Rich Beaulieu for

25   the defendants.  As long as I don't take what you're saying to

1  mean that we would exchange expert reports and designations

2  simultaneously.

3          THE COURT:  I think we can agree.

4          MS. ANELLO:  Oh, I like that rule.

5          THE COURT:  No.

6          MR. BEAULIEU:  We do not.  And that's not what the

7  federal rules provide for.

8          THE COURT:  Yeah, I agree.  You-all ought to give

9  yours.  And then how long do you have now, you have about three

10 weeks?

11         MR. BEAULIEU:  About 30 days, Your Honor.

12         THE COURT:  Say again.

13         MR. BEAULIEU:  About 30 days, Your Honor.

14         THE COURT:  Three days?

15         MR. BEAULIEU:  30 days.

16         THE COURT:  Oh, 30 days.  Okay.  So why don't you

17 guys do yours, why don't we just extend yours until the day

18 that discovery closes, August 20th, and then why don't we give

19 you-all 30 days after that.  Does that mean you then have to do

20 discovery of experts or depositions of experts after that?

21         MR. BEAULIEU:  Yes, but I wouldn't anticipate -- I

22 mean, it depends on expert availability, but that's not --

23         MS. ANELLO:  Yes.  I anticipate we would be doing

24 depositions of experts, but with the understanding that it

25 would be done within this period.

1            THE COURT:  Oh, you would do expert -- no, you can't

2    do expert depositions until after you get your reports.

3            MS. ANELLO:  I'm sorry.  Maybe I misunderstood the

4    question.  I was talking about expert discovery but after

5    serving the reports at the new August 20th date.

6            THE COURT:  Right.  So if you serve yours on the 20th

7    and they serve theirs around September 20th, whatever is a date

8    that's not a weekend in there.

9            MS. ANELLO:  Would you like us to maybe craft and

10   coordinate that email with Mr. Martin?

11           THE COURT:  No, let's just do it now.  Then that

12   means you're both going to want to depose each other's experts

13   after that time, right?

14           MS. ANELLO:  Yes, correct.

15           MR. BEAULIEU:  So sometime around the end of October

16   then?

17           THE COURT:  That's fine.

18           MR. BEAULIEU:  That would be 30 days after our expert

19   reports are due.

20           THE COURT:  That's fine.  And then that kicks the

21   summary judgment period as well, right?

22           MR. CHARLES:  Yes.

23           MS. ANELLO:  Correct.

24           THE COURT:  So that kicks summary judgment into --

25   how long do you have after the close of discovery to do summary

1  judgment?

2          MR. CHARLES:  30 days, I believe.

3          THE COURT:  Okay.  So that would kick defendants'

4  motion for summary judgment to 30 days after whatever date we

5  just said for the experts discovery to be done?  Is that right?

6          MR. BEAULIEU:  Yes, sir.

7          THE COURT:  Harry, did you get those dates?

8          COURTROOM DEPUTY:  Yes, sir.

9          THE COURT:  So you can just put them on the record.

10  We'll do a docket entry to set those dates.  There's no plan

11  for rebuttal experts; is that right?

12          MS. ANELLO:  There was a plan for rebuttal experts,

13  it was currently August 6th, which was about 30 days after the

14  defendants' expert witnesses.  We could probably move it down

15  to three weeks.

16          THE COURT:  Okay.  So that changes it a little bit.

17  Or does that mean we can still do depositions during that time?

18  So you-all want to do plaintiff's expert then defendants'

19  expert then rebuttal experts then depositions?  Or do you have

20  depositions before rebuttals?

21          MR. BEAULIEU:  I think it has to be the first way,

22  Your Honor, otherwise we don't have the opportunity to depose

23  the plaintiff's experts on their rebuttal reports.

24          THE COURT:  Right.  So you want rebuttal witness --

25  rebuttal experts before depositions?

1          MR. BEAULIEU:  Yes.  Yes, Your Honor.

2          THE COURT:  Okay.  I think that makes sense.  We have

3    another case where we're dealing with it in the other context.

4    And it seems a little unfair to have the depositions and then

5    the rebuttal.  I mean, it just seems like -- I don't know how

6    that happened, but it happened in another case we inherited.

7          MS. ANELLO:  I just had that happen as well.

8          THE COURT:  Okay.  So does that make sense?  We'll

9    have plaintiff's expert due on August 20th.  30 days later,

10   we'll have defendants' expert due.  21 days later, we'll have

11   rebuttal expert, 30 -- within the next 30 days, expert

12   depositions will occur.  And then within 30 days after that,

13   after that 30-day period ends, during which the experts can be

14   deposed, 30 days after that, defendants' motion for summary

15   judgment will be due.  Does that make sense?

16         MS. ANELLO:  Yes, Your Honor.

17         THE COURT:  Okay.  I'd like you-all to keep moving

18   with the discovery so as to not to have to move further.  We

19   will rule fairly quickly on this motion.  I don't know which

20   way we're going to come out, but I would anticipate giving

21   leave to amend.  I would anticipate, subject to me thinking

22   about it more, ruling that there is not adequate jurisdiction

23   on the two defendants that are in -- the Japanese defendants,

24   and that there needs to be some amendment to the pleadings for

25   specificity, probably on the negligence and certainly on the

1    fraud-based claims, but that you get leave to amend that.  And

2    then discovery should continue, okay?  Aren't there cases in

3    which discovery doesn't start until motions to dismiss have

4    been decided?

5            MR. BEAULIEU:  Yes, Your Honor, some local rules in

6    various districts across the country differ on that.

7            THE COURT:  Okay.  Was that considered?  This came

8    from Judge Batten; is that right?

9            MR. BEAULIEU:  Yes, Your Honor.

10           THE COURT:  He does not do that?

11           MR. BEAULIEU:  His standing order at the time did not

12   provide a stay of discovery as a matter of course when motions

13   to dismiss were filed.

14           THE COURT:  Okay.

15           MS. ANELLO:  I've been in courts where they've been

16   both ways.

17           THE COURT:  I'm just trying to figure out which way

18   I'm going to do it.  I see the benefit of doing it the other

19   way, but if I were to grant a motion to dismiss, all of that

20   would have been for nothing.  Okay.  Okay.  All right.

21   Anything else?

22           MR. CHARLES:  No, Your Honor.

23           THE COURT:  Everybody good?  No?  Nothing?  Okay.

24   Thank you.

25

1        (Whereupon, the proceedings were adjourned at 5:07

2   p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTERS CERTIFICATE

1

2

3

4          I, Jana B. Colter, Official Court Reporter for the
5   United States District Court for the Northern District of
6   Georgia, with offices at Atlanta, do hereby certify:
7          That I reported on the Stenograph machine the
8   proceedings held in open court on May 21, 2018, in the matter
9   of *CARYL QUASHIE V. OLYMPUS AMERICAN, INC. ET AL*, Case Number
10  1:17-CV-03081-MLB; that said proceedings in connection with the
11  hearing were reduced to typewritten form by me; and that the
12  foregoing transcript (82 Pages) is a true and accurate record
13  of the proceedings.
14         This the 13th day of June, 2018.
15
16
17
18                            _____
                              /s/ Jana B. Colter, FAPR, RMR, CRR, CRC
19                                 Official Court Reporter
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA